# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NUMBER 14-0164** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **GERSON D. GUEVARA-MIRANDA** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion to suppress [doc. # 21] filed by defendant Gerson D. Guevara-Miranda.  For reasons stated below, it is recommended that the motion be DENIED.

## Background

On May 23, 2014, Louisiana State Police Senior Trooper Christopher Wright stopped a vehicle driven by Gerson D. Guevara-Miranda for a traffic violation on Interstate 20 in Ouachita Parish, Louisiana.  Pursuant to the stop, Trooper Wright ultimately uncovered and seized unspecified amounts of cocaine and marijuana from a large, black duffel bag in the vehicle's rear compartment.

On August 27, 2014, a federal grand jury returned a three count indictment against Guevara-Miranda for possession of cocaine and marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1), plus illegal reentry of a removed alien in violation of 8 U.S.C. § 1326(a).

On November 6, 2014, Guevara-Miranda, via counsel, filed the instant motion to suppress all evidence seized, and any incriminating statement he made, as a result of the purportedly unlawful stop and search of his vehicle.   Following a delay for briefing and a

December 16, 2014, evidentiary hearing, the matter is now before the court.[1]

<strong><u>Evidence and Testimony</u></strong>

The following facts were established via the testimony and evidence presented at the hearing held in this matter.  Only two witnesses testified at the hearing:  Louisiana State Police troopers, Christopher Wright and Keith James.  Wright is a ten year veteran of the Louisiana State Police.  (Tr. 3 [doc. # 34]).  For the past five years, he has been assigned to criminal patrols in the Troop E area.  (Tr. 3-4).  Over the years, he has been involved in thousands of motor vehicle stops.  *Id*.

On May 23, 2014, at approximately 12:45 p.m., Troopers Wright and James were conducting criminal patrol operations on I-20 in Ouachita Parish.  (Tr. 5, 32, 62).  They were looking for human trafficking, illegal narcotics, wanted persons, basically anything that they could "acquire" that day.  (Tr. 62).  Wright's vehicle was in the median mostly facing west and observing the eastbound traffic.  (Tr. 6).  Trooper James was in a separate vehicle, parked on the driver-side of Wright, also facing west.  (Tr. 7-8, 62).  Trooper Wright noticed Guevara-Miranda's vehicle from the other passing cars because it slowed down considerably.  *Id*.  In addition, as Guevara-Miranda passed by the troopers' position in the outside lane, Wright and James both observed Guevara-Miranda look away while the right side of his car traversed the white fog line.  (Tr. 7-8, 32, 63-64).  Because he had his windows rolled down, Trooper Wright also heard Guevara-Miranda's tires run over the rumble strips.  (Tr. 7-8).  Wright believed that by crossing the fog-line, Guevara-Miranda had violated Louisiana Revised Statute 32:79.  (Tr. 33-36).  Wright also did not observe any circumstances that would potentially justify Guevara-Miranda's straying outside his lane of traffic.  (Tr. 58).  Accordingly, Wright entered the

---

[1]  Defendant filed a post-hearing brief on January 12, 2015.  [doc. # 36].  The government filed its post-hearing brief on January 18, 2015.  [doc. # 37].

interstate, caught up to Guevara-Miranda's vehicle, and initiated a traffic stop. (Tr. 8).

Wright's vehicle was equipped with a mobile recording data system that is constantly on. (Tr. 9, 36-37). Once Wright activates his lights to pull someone over, the system records the encounter to the hard drive, beginning some 20 to 30 seconds *before* the lights were activated. (Tr. 9-11, 36-37). The sound portion of the recording was captured via microphone attached to Wright's belt. (Tr. 37). Wright agreed that the video, which was admitted into evidence as Government Exhibit No. 1, fairly and accurately depicts what transpired during the traffic stop. (Tr. 10).

At the video's one minute mark, the vehicles came to a stop on the outside shoulder of the interstate. (Gov't Exh. 1, 1:00). At the 1:30 mark, Trooper Wright greeted Guevara-Miranda at the front passenger-side window and began to converse with him. *Id.*, 1:30. Wright was wearing his state police uniform, badge, and service weapon. (Tr. 49). Wright initially asked Guevara-Miranda whether he had his driver's license or "ID" on him. (Gov't Exh. 1, 1:30). Instead, however, Guevara-Miranda handed Wright his Honduran passport, which is not considered a valid driver's license in Louisiana, and therefore is a separate, ticket-able offense. (Tr. 12, 42). Wright then asked Guevara-Miranda in Spanish whether he spoke English. *Id.*; Gov't Exh. 1, 1:44. Guevara-Miranda replied "un poquito" or a little bit. *Id.* Wright asked Guevara-Miranda (in Spanish) where he was going. *Id.* Guevara-Miranda replied that he was going to visit his brother who was at a hospital in Mississippi. (Tr. 13-14). Wright asked him what part of Mississippi, what hospital, and how he knew how to get there? (Gov't Exh. 1, 2:25). He again inquired, "[w]here's the hospital at?" *Id.*, 2:39. "Yeah, where at in Mississippi, what town, what city?" *Id.*, 2:44. After more than one minute of silence, Wright told Guevara-Miranda, "okay, be right back, okay?" *Id.*, 3:56. Because of the language barrier, Wright was not sure what Guevara-Miranda had been trying to tell him. (Tr. 44).

Wright noticed that throughout the initial encounter, Guevara-Miranda remained "locked onto the steering wheel," with his gaze transfixed on the road ahead.  (Tr. 14).  Based on Wright's experience, Guevara-Miranda appeared to be very nervous.  (Tr. 43).

On the way back to his patrol unit, Wright paused and used his flashlight to peer into the rear compartment of Guevara-Miranda's vehicle.  (Gov.'t Exh. 1, 4:00-4:04).  Wright explained that he stopped to look because, at that point, he was thinking that there could have been some human smuggling going on.  (Tr. 15).  The only thing he observed, however, was a large, black duffel bag.  *Id*.

Once in his car, Wright began to run checks on Guevara-Miranda using his in-car computer system.  (Tr. 16).  Specifically, Wright was looking for a driver's license for him, but was unable to find anything.  (Tr. 16-17).

At the 9:05 mark, Trooper James asked Wright over the radio whether he was "good." (Gov.'t Exh. 1; 9:05).  Wright responded, "I'm gonna look."  *Id*.; Tr. 47.  James replied, "well, I'm coming back around."  *Id*.

At the 9:30 mark of the recording, Trooper Wright radioed Troop F and provided them with Guevara-Miranda's name and date of birth, and asked them to run a criminal history out of Texas or for anything federal.  (Gov.'t Exh. 1, 9:30; Tr. 17).

At approximately the 11:30 mark, Trooper James arrived on scene.  (Gov.'t Exh. 1, 11:30; Tr. 18).  Wright told him "may be nothing to it."  *Id*.  He then added, "first he said he was going to see his brother who was having surgery in Mississippi.  Then, he said he was going to see his mother."  (Gov.'t Exh. 1, 11:30-11:48).  Wright conceded, however, that there was a bit of a language barrier too.  *Id*.  James reassured Wright that it "was worth a shot."  *Id*., 11:53.

Wright then remarked to James, "I like that he just got insurance – yesterday."  *Id*., 11:59-12:11.  At the hearing, Wright explained that "[i]t's a common indicator that we see

4

sometimes involved in trafficking narcotics, human trafficking, thefts.  A lot of people, for that trip, they'll make sure they have insurance to make it appear that they're following the law."  (Tr. 18).

Wright then remarked to James that Guevara-Miranda had not been "stamped in at all." (Gov.'t Exh. 1, 13:01).  He meant by this that Guevara-Miranda's passport did not have an entry stamp.  (Tr. 50-51).

At the 13:21 mark, Wright commented that he was "going to look," and exited his vehicle with his clipboard and an attached written consent to search form, entitled Louisiana Department of Public Safety and Corrections Consent to Search Form.  (Gov.'t Exh. 1, 13:21; Tr. 19-20). The top part of the form is in English and the bottom is in Spanish.  *Id*.  The Spanish version is a translation of the English portion of the form.  *Id*.  Wright had pre-filled the blanks on the form, and signed it in the space for the state police officer to sign.  (Tr. 21).

The form contains blanks for names, addresses, dates, location, and the residence or vehicle to be searched.  (Gov.'t Exh. 2).  It states that the signatory voluntarily authorizes the specified trooper to search the specified residence, object, or vehicle (in this case, Guevara-Miranda's vehicle, a 2003 KIA, Texas License Plate # CWP4472),

> and its contents, which are owned or controlled by me and remove any items the Louisiana Office of State Police deems pertinent to their investigation, providing a receipt is furnished for the removed items.  No promise, threat, or coercion of any kind has been made against me by the Louisiana Office of State Police and I have been informed by the above named officer that I may refuse to consent to any search and that I may revoke my consent to search at any time.

(Gov.'t Exh. 2).

Wright went to Guevara-Miranda's passenger-side window, and told him to step back here.  (Gov.'t Exh. 1, 13:42).  After Guevara-Miranda exited the vehicle, Wright motioned him with his hand to approach the front of Wright's unit.  *Id.*, 13:56.  Wright placed the clipboard on the hood of his unit, pointed to it, and asked Guevara-Miranda whether he could read it.  *Id.*,

5

14:02.  Guevara-Miranda replied affirmatively, "uh, huh."  *Id.*, 14:03.  While pointing at the clipboard, Wright explained to Guevara-Miranda, "read that to yourself, and if you agree with it, _____ right there."  *Id.*, 14:04-14:07.  Without hesitating, Guevara-Miranda replied, "okay."  *Id.* Wright again urged Guevara-Miranda to "read it first, read it."  *Id.*, 14:10.

At that point, Trooper James took up position to the side and behind of Guevara-Miranda. *Id.*, 14:13.  Guevara-Miranda began to read the form, in earnest, at the 14:10 mark.  *Id.*, 14:10. Ten seconds later, as he continued to read the document, he nodded his head in agreement and stated, "yeah."  *Id.*, 14:20.  Also, at that point, Trooper James moved away from his position behind Guevara-Miranda, and returned to the rear of Wright's unit.  *Id.*

Guevara-Miranda next peers more intently at the bottom of the form.  *Id.*, 14:24.  He again nodded his head in apparent agreement.  *Id.*, 14:32.  Trooper Wright then inquired whether it was "good."  *Id.*, 14:34.  Guevara-Miranda quickly nodded, and said affirmatively, "hmmm, hmmm."  *Id.*  As he handed him a pen, Wright asked Guevara-Miranda in Spanish whether there were any drugs in the car, to which Guevara-Miranda smiled, and replied, "nah." *Id.*, 14:39; Tr. 53, 56.  Guevara-Miranda pointed to the form and asked Wright whether (or where) he needed to put his name.  *Id.*, 14:43.  Guevara-Miranda then signed the form.  *Id.*, 14:54; Tr. 21; Gov.'t Exh. 2.

Wright took the clipboard and placed it on the hood of unit, together with Guevara-Miranda's passport.  *Id.*, 14:58.  Wright did not make any threats or recommendations to Guevara-Miranda.  (Tr. 21).  He also did not ask Guevara-Miranda whether he understood the form, nor did he orally advise him that he could refuse to sign it.  (Tr. 54).

Wright asked Guevara-Miranda whether he had any weapons.  *Id.*, 15:01.  Guevara-Miranda replied, "nah."  *Id.*  Wright then frisked him for purposes of officer safety.  *Id.*; Tr. 22.

As Guevara-Miranda looked on, Wright proceeded to open one of the passenger-side

doors of Guevara-Miranda's vehicle.  *Id*., 15:32.  Wright then opened the vehicle's hatchback.
*Id*., 15:40.  He reached in and unzipped the black duffel bag whereupon he observed several
large bundles of what he immediately recognized to be narcotics, which later tested positive for
marijuana and cocaine.  *Id*., 16:06; Tr. 24, 31.  Wright turned around and told James to "1015" or
arrest Guevara-Miranda.  *Id*., 16:10; Tr. 23.

Trooper James later told Wright "I wish I had good eyes like you, I was looking at a
different vehicle."  *Id*., 19:21; Tr. 26, 28.  Wright muted the video at the 22:27 mark because he
was finished talking to Guevara-Miranda.  *Id*., 22:27; Tr. 30, 68-69.  The video ends at the 43:32
mark with the arrival of Wright and Guevara-Miranda's vehicles at Troop F headquarters.  *Id*.

At all relevant times, Trooper Wright also had a K-9 in his unit.  (Tr. 25).  In the event
that Guevara-Miranda had refused consent to search, Wright would have deployed the K-9.  *Id*.

Wright testified that he does not typically arrest individuals for not having a driver's
license.  (Tr. 27).  The only criminal history that dispatch uncovered for Guevara-Miranda was a
prior deportation.  (Tr. 27-28).  Wright agreed that at no time, from the beginning of the stop
through the time of the arrest, was Guevara-Miranda free to leave.  (Tr. 57).  He explained that
Guevara-Miranda could not leave without a valid driver's license.  (Tr. 58).

## Law and Analysis

### I.      The Stop and Detention

"A person is seized by the police and thus entitled to challenge the government's action
under the Fourth Amendment when the officer, by means of physical force or show of authority,
terminates or restrains his freedom of movement, through means intentionally applied."
*Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 2405 (2007) (citations and internal
quotation marks omitted).  A traffic stop entails a seizure for purposes of the Fourth Amendment.
*Id*.; *see also, United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (stopping a

vehicle and detaining its occupant(s) constitutes a seizure).  Traffic stops, whether supported by probable cause or a reasonable suspicion, are treated as *Terry* stops.  *Brigham, supra*.  (citations omitted).

Under *Terry*, a law enforcement officer may temporarily detain a person when the "officer has a reasonable, articulable suspicion that a person has committed or is about to commit a crime." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868 (1968)).  Reasonable suspicion may be described as "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Id*. (citing *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657 (1996)).  To satisfy the Fourth Amendment, the stopping officer must be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S.Ct. 673 (2000)).  Nonetheless, the Fourth Amendment requires but a "minimal level of objective justification for making the stop," and requires "a showing considerably less than preponderance of the evidence." *Id*. (citation omitted).  The validity of the stop is determined under "the totality of the circumstances-the whole picture." *Id*.  (citing *United States v. Sokolow*, 490 U.S. 1, 7-8, 109 S.Ct. 1581 (1989)).

A *Terry* analysis is two-tiered:  (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop.  *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993) (citing *Terry*, 392 U.S. at 19-20); *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001).  Typically, the defendant bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional.  *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citation omitted).   However, when, as here, the law enforcement officer acts without a warrant, the government bears the burden of proving that the

search was valid.  *Id*.

a)      *Terry's* First Prong

"For a traffic stop to be justified at its inception, an officer must have an objectively

reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is

about to occur, before stopping the vehicle."  *United States v. Lopez-Moreno*, 420 F.3d 420, 430

(5th Cir. 2005).

In this case, it is uncontroverted that Trooper Wright observed (and heard) the passenger-

side tires of Guevara-Miranda's vehicle traverse the "fog" line that marks the edge of the travel

lane.  Furthermore, Wright did not observe any potential justification to excuse the infraction.

Having observed and listened to Trooper Wright at the hearing, the court finds his testimony to

have been earnest, persuasive, and entirely credible.

The pertinent statute provides that "[a] vehicle shall be driven as nearly as practicable

entirely within a single lane and shall not be moved from such lane until the driver has first

ascertained that such movement can be made with safety."  La. R. S. § 32:79(1) (in pertinent

part).  The Louisiana Second Circuit Court of Appeal has recognized that when, for no apparent

reason, a car partially leaves its lane of travel and crosses the fog line, a police officer has

probable cause to believe that a traffic infraction has occurred.  *State v. Malone*, 56 So. 3d 336,

343 (La. App. 2d Cir. 2010) (citation omitted).  Similarly, the Louisiana Supreme Court has

stated that "[i]n Louisiana, as in other jurisdictions, a car which partially leaves its lane of travel

and crosses the fog line either at the center of a divided highway or on the right hand shoulder of

the road therefore provides the police with probable cause to believe that a traffic violation for

improper lane use has occurred."  *State v. Waters*, 780 So.2d 1053, 1056 (La. 2001) (citations

omitted).  Moreover, the Fifth Circuit has held that an abrupt lane change with an associated

momentary crossing of the fog line, *even if apparently made to avoid construction*, constitutes a

violation of Louisiana Revised Statute 32:79, sufficient to provide an officer with probable cause to initiate a traffic stop. *United States v. Jones*, 185 F.3d 459, 464 (5th Cir. 1999).

Applying the foregoing authority here, the court readily finds that the stop was supported by Wright's objectively reasonable suspicion that Guevara-Miranda had committed a traffic violation.

 b) *Terry's* Second Prong

The second prong of the *Terry* inquiry focuses upon whether the stopping officer's actions were

> reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop. This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop unless further reasonable suspicion, supported by articulable facts, emerges.

*Brigham*, 382 at 507 (citations omitted).

The Fifth Circuit has recognized that pursuant to an initial traffic stop, a police officer may (1) examine the driver's license and registration of the driver and vehicle, and run a computer check to investigate whether the driver has any outstanding warrants and if the vehicle was stolen; (2) ask the driver to exit the vehicle; and (3) ask the driver and any passengers about the purpose and itinerary of their trip, including other unrelated questions. *See generally Brigham*, 382 F.3d at 508; *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999); *Shabazz*, 993 F.2d at 437. "[T]he officer's questions need not even be related to the purpose of the traffic stop, since '[d]etention, not questioning, is the evil at which *Terry's* second prong is aimed.'" *Lopez-Moreno*, 420 F.3d at 431. Detention during these actions is reasonable under the Fourth Amendment.

"Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention." *Lopez-Moreno*, 420 F.3d at

431 (citations omitted).  "[T]o continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed." *United States v. Santiago*, 310 F.3d 336, 342 (5th Cir. 2002) (citation omitted).  "[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed."  *Lopez-Moreno*, 420 F.3d at 431 (citations omitted).  Reasonable suspicion "exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure."  *United States v. Estrada*,  459 F.3d 627, 631-632 (5th Cir. 2006) (citation omitted). Reasonable suspicion depends upon the "totality of the circumstances and the collective knowledge and experience of the officer or officers."  *Id*.

In this case, Wright's initial questioning of Guevara-Miranda was fully within the scope of the traffic stop.  In fact, when, in response to Wright's initial inquiries, Guevara-Miranda failed to produce a driver's license, that provided Wright with probable cause that Guevara-Miranda had committed another traffic violation.  In addition, the length of the initial questioning (approximately three minutes) was not unreasonable.  *See Brigham, supra* (seven minutes of initial questioning not unreasonable).

Furthermore, Wright's request to search did not extend the duration of the stop because there is no evidence that the purpose of the initial stop had concluded.  Wright testified that he would not have permitted Guevara-Miranda to resume his journey because he did not have a driver's license,.  *See* Tr. 27, 53.  In addition, it is unclear from the record whether dispatch had returned the results of Guevara-Miranda's criminal history check before Wright sought permission to search,.  (Tr. 49-50).  If Wright was still awaiting the results of the remote

11

computer search, then the request to search did not extend the stop.[2]

In any event, the court finds that, despite some contemporaneous equivocation openly acknowledged by Wright, he nonetheless acquired additional reasonable suspicion sufficient to seek consent to search.  Indeed, Wright cited Guevara-Miranda's excessive nervousness, his inconsistent/uncertain travel plans (albeit, possibly caused by the language barrier), his purchase of car insurance only one day earlier, and the lack of authorization in his passport to support entry into the country.

The cumulative effect of these observations provided the troopers with reasonable suspicion sufficient to extend the stop.  *See United States v. Sierra*, 294 Fed. Appx. 884 (5th Cir. Sept. 30, 2008) (unpubl.) (nervousness, plus maps of drug trafficking towns not on driver's expressed itinerary created reasonable suspicion of criminal activity); *Pack, supra* (reasonable suspicion of criminal activity created by extreme nervousness, conflicting story, and travel along drug corridor); *Brigham, supra* (citing *United States v. Gonzalez*, 328 F.3d 755, 758-759 (5th Cir. 2003) ("driver's nervousness, hesitation in responding to basic itinerary questions, lies about identification, presence on a drug trafficking corridor, and prior arrests for drug trafficking, taken together, gave rise to a reasonable and articulable suspicion of drug trafficking."); *United States v. Rodriguez*, 155 Fed. Appx. 753 (5th Cir. Nov. 21, 2005) (unpubl.) (driver's delay in pulling over and exiting vehicle, excessive nervousness and sweating, repeated declarations that he wanted no problems, and prior narcotics arrests provided reasonable suspicion).[3]

_____

[2]  No Fourth Amendment harm is done where the officer asks the occupants of a vehicle questions while waiting for routine computer checks to be processed.  *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010), opinion modified on denial of rehearing, 622 F.3d 383 (5th Cir. 2010).

[3]  Although superfluous to a finding of reasonable suspicion in this case, the court further observes that the traffic stop occurred on a known drug corridor.  *See United States v. Jenson*, 462 F.3d 399, 405-406 (5th Cir. 2006) (recognizing that I-20 is a known drug corridor).

## II.    Consent to Search

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST., AMEND. IV.  Thus, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions."  *California v. Acevedo*, 500 U.S. 565, 580 (1991).  One such exception authorizing a warrantless search is if it is conducted pursuant to the defendant's voluntary consent.  *United States v. Davis*, 749 F.2d 292, 294 (5th Cir. 1985) (citation omitted).  Two different standards apply to determine whether a defendant consents to a search:  "'the normal standard for *consensual searches that occur subsequent to legal stops*' and the heightened consent standard that applies to a consent to search obtained after an illegal stop."  *United States v. Sanchez-Pena*, 336 F.3d 431, 442 (5th Cir. 2003) (citation omitted).

In this case, because the stop was valid and the troopers developed reasonable suspicion to extend the stop, the normal standard is applicable.  *See Estrada*, 459 F.3d at 633.  Thus, the government's burden to prove consent is not as great as if there had been an antecedent Fourth Amendment violation.  *Id*. (citation omitted).  Furthermore, "[a]bsent any limitation placed by the suspect, his consent to search a car will support an officer's search of unlocked  containers within it.*"  United States v. Iraheta*, 764 F.3d 455, 462-63 (5th Cir. 2014) (citation omitted).

Under the normal standard, a valid consent to search must be "free and voluntary." *Shabazz*,  993 F.2d at 438 (citation omitted).  The government typically carries the burden of proving voluntary consent by a preponderance of the evidence.  *Id*.  "The voluntariness of consent is a question of fact to be determined on the totality of the circumstances."  *Id.*  To determine whether consent to search was obtained voluntarily, the courts consider the following factors, (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive

13

police tactics; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) his education level and intelligence; and (6) his belief that no incriminating evidence will be found.  *Id.*  Although all six factors are relevant, no single factor is dispositive.  *Id.*

   Applying the foregoing considerations here, the court finds that,

1)  At the time of the consent, Wright had not returned Guevara-Miranda's  passport or otherwise told him that he was free to go.  Accordingly, this factor is construed against the government.  *Jenson*, 462 F.3d at 407, n9 (citation omitted).

2)  However, there was no evidence of coercive police tactics.  Although there were two troopers at the scene (and a non-deployed K-9 in the police car), all of the questioning was handled by a single trooper – Wright.[4]  Moreover, by retaining the detainee's identification documents, an officer is not considered to be acting coercively when, as here, the stop has been lawfully extended, and therefore, remains incomplete.  *United States v. Brown*, 567 F. App'x 272, 284 n.5 (5th Cir. 2014).  The video further confirms that Trooper Wright was not overbearing and that he conducted himself in a professional manner throughout the encounter. In fact, he repeatedly urged Guevara-Miranda to read the written consent form, which included a Spanish translation.  After Guevara-Miranda appeared to finish reading the form, Wright ensured that Guevara-Miranda was "good" with it.

3)  Guevara-Miranda fully cooperated with the troopers.  He complied with all directives to the best of his apparent ability.  He even smiled in response to questioning.

4)  Guevara-Miranda appeared to read the consent form provided to him by the troopers, which specifically advised him, in Spanish, that he had the right to refuse to consent and that he

---

[4]  At one point, Trooper James stood behind Guevara-Miranda.  However, he remained there but briefly before moving away.

could revoke his consent at any time.  The video reveals Guevara-Miranda nodding in apparent agreement as he pored over the consent form.  Guevara-Miranda then proceeded to sign the consent form.  The court finds that defendant was aware of his right to refuse and/or revoke consent to search.

5)   No direct evidence of Guevara-Miranda's education or intelligence was adduced at the hearing.  However, he appeared to be able to read and comprehend the consent to search form.

6)   Given that the contraband was stashed in a duffle bag placed in plain view in the vehicle's open, rear compartment, Guevara-Miranda could not realistically have believed that the troopers would not discover the contraband during a search.  This assumes, of course, that Guevara-Miranda knew that the bag contained contraband.

Upon consideration of the totality of the circumstances, the undersigned finds that Guevara-Miranda's consent was free and voluntary.  *See e.g., Estrada, supra* (consent freely given where defendants were calm and cooperative and police did not employ coercive tactics); *see also Brown, supra*.

### III.   Inevitable Discovery Rule

In the event that the court *had* determined that defendant's consent was not voluntary, the government urged the court to sustain the search pursuant to the inevitable discovery rule.  The government emphasized that if defendant had refused consent, then Trooper Wright would have deployed his K-9, which then would have alerted to the presence of contraband.  However, this court has declined to apply the inevitable discovery rule under similar circumstances where, as here, there was no evidence, *inter alia*, as to the K-9's reliability.  *United States v. Iraheta*, 2013 WL 1501039, at *3 (W.D. La. Apr. 11, 2013) aff'd in part, 764 F.3d 455 (5th Cir. 2014).  In any event, given the undersigned's finding that Guevara-Miranda's consent was voluntary, the issue is moot.

15

### IV.    Incriminating Statements

Defendant contends, in brief, that, after his arrest, he made unspecified incriminating statements during an interrogation.[5]  He sought suppression of these statements because they were the product or fruit of the alleged Fourth Amendment violation.  However, having determined that there was no Fourth Amendment violation, any incriminating statements cannot be excluded on that basis.

In addition, no evidence was presented of a post-arrest interrogation or of any incriminating statements made by defendant.  Accordingly, the undersigned makes no determination as to the voluntariness of these unspecified statements or their admissibility at trial (aside from the present argument premised on the alleged Fourth Amendment violation).[6]

### Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the motion to suppress [doc. # 21] filed by defendant Gerson D. Guevara-Miranda be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED**

---

[5]  The government apparently agrees.  (Gov't. Resp., pg. 2).

[6]  Albeit, Trooper James testified that he read Guevara-Miranda "his rights" after he handcuffed him and placed him in his unit.  (Tr. 66-67).

16

**FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 20th day of January, 2015.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE

17